O

1
2
3
4
5
6
7
8
9      UNITED STATES DISTRICT COURT
10     CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION
11
12
13  DAVID GROBER et al.,                    )   Case No. CV-04-8604-SGL (OPx)
                                            )
14                      Plaintiffs,         )
                                            )
15          v.                              )   ORDER DENYING PLAINTIFFS'
                                            )   MOTION FOR RECONSIDERATION;
16                                          )   ORDER GRANTING IN PART
    MAKO PRODUCTS, INC. et al.,             )   PLAINTIFFS' MOTION TO DISCHARGE
17                                          )   ATTORNEYS; ORDER DENYING
                        Defendants.         )   DEFENDANTS' MOTION FOR
18                                          )   SUMMARY JUDGMENT ON CO-
                                            )   INVENTORSHIP; ORDER DENYING
19  _____         )   DEFENDANTS' REQUEST TO
                                                EXCLUDE MR. GROBER

20          This is a patent infringement case concerning a movie camera stabilization device

21  known as the Perfect Horizon.  The device is used for filming while on a unstable surface

22  like water or while filming from a moving vehicle.  David Grober invented the Perfect

23  Horizon and received both an Academy Award in technical achievement and also a United

24  States patent, U.S. Patent No. 6,611,662 ("the '662 patent"), the latter being at issue in this

25  case.

26          The Court conducted a *Markman* hearing regarding the '662
            patent and, on June 4, 2009, issued its decision construing one
27          of its claim terms among the many placed in issue by the
            parties.  In that decision, the Court observed that construction
28          of the claim term "payload platform" contained in claim 1 to the
    Because 662 patent was determinative:
            the question of what exactly is meant by the term 'payload platform,' the

1  |  Court has confined its focus on that term for purposes of its *Markman*
2  |  decision.  Construing the meaning of the other disputed claim terms is
   |  unnecessary given the conclusion the Court reaches in regard to the
3  |  meaning of the claim term 'payload platform' and the fact that the parties did
   |  not dispute during oral argument that, with such a construction of the term,
   |  the accused device would not infringe the '662 patent.

*Grober v. Mako Products, Inc.*, 2009 WL 1587158, at *2 (C.D. Cal. June 4, 2009).

For support of this latter statement — that the parties agreed, should the Court

adopt defendants' construction of "payload platform," there would be no infringement by

the accused device (defendants' MakoHead)  — the Court cited to plaintiffs' framing of the

question for the Court set forth on page 2 of its *Markman* reply briefs.  In that portion of its

brief, plaintiffs' counsel made the following concession:

> Mako is now putting before the Court a series of claim
> interpretations in an effort to allow the MakoHead accused
> product *to skirt infringement.*  One of defendants' proposals is
> akin to taking Grober's payload platform . . . cutting it into three
> (or more) pieces, bolting the pieces back together, and defining
> only the innermost piece as the 'payload platform.'  In copying
> Grober's Perfect Horizon with sensors mounted to the payload
> platform, *defendants must now prevent the payload platform,*
> *except the center plate, from being defined as the payload*
> *platform to avoid infringement.*  Plaintiff anticipates Mako will
> argue that *only the center silver plate in Exhibit 3 be designated*
> *the payload platform, asking the Court to exclude the rest of the*
> *structure* [despite the fact that] *the entire structure perform[s]*
> *as the payload platform* . . . .  Plaintiff hopes this Court will see
> the obvious *equivalence* that a *structure,* cut in pieces and
> bolted back together, is *equivalent* to the *original structure in its*
> *purpose and function.*

(Reply at 2 (emphasis added)).[1]

---

[1]  At the outset of the *Markman* hearing itself plaintiffs' counsel deferred to defense counsel about whether construction of the term "payload platform" was dispositive ("Mr. Lauson: Would you like to speak on that, Brian?") and when defense counsel stated that it was ("Mr. Warwick: You are exactly right the payload platform is to me unique in this *Markman* hearing portion of the case critical and will dispose of many of the issues to come down one way or the other") plaintiffs' counsel did not rise to disagree despite the fact that the Court informed both sides that it "would like to hear from both sides on that." Plaintiffs' counsel deferment to opposing counsel on the subject and then not objecting to defense counsel's characterization conveyed that plaintiffs similarly shared the same view on the matter.  Not surprisingly, the remainder of the *Markman* hearing was devoted to the claim term "payload platform" with neither side seeking to raise additional arguments or points concerning the other terms in dispute in their papers.  Plaintiffs' later statement following the *Markman* decision that they did not concede non-infringement is belied by their conduct during the hearing itself.  Nonetheless, the Court has proceeded to re-

(continued...)

From this it is clear that plaintiffs conceded that, should the Court adopt defendants' construction of the term "payload platform" (which in fact the Court ultimately did do),[2] then the accused product (defendants' MakoHead) would not literally infringe the '662 patent (such a construction allowing defendants to "skirt infringement").  When the Court in its *Markman* decision adopted defendants' proposed construction of "payload platform," it further concluded that it need not "go further in construing the many other terms offered for consideration by the parties in their *Markman* briefs" because "such a definition results in a finding of non-infringement."  2009 WL 1587158, at *12.  The Court in its June 22, 2009, Order simply found that the various pending motions before the Court had been rendered moot on account of this earlier finding of non-infringement in the *Markman* decision.

---

[1](...continued)
analyze the issue now re-raised by plaintiffs concerning their theory of infringement first advanced in their *Markman* reply brief itself.

[2]  It is also clear from the Court's *Markman* decision, that the Court did in fact adopt defendants' proposed construction.  Although the literal verbiage is slightly different, the end result is the same.  As noted in the *Markman* decision, defendants' proposed construction was that of a "platform on which the payload (e.g., camera) is directly mounted and not any other element of the device."  2009 WL 1587158, at *3.  During the *Markman* hearing itself, defense counsel remarked that the central point of defendants' proposed construction was that a payload platform was "a horizontal surface that is the location of the payload that it is attached to."  As the Court later noted in its *Markman* decision, the point of defendants' proposed construction was "to limit the payload platform to the horizontal surface or plate upon which the device in question is directly mounted or affixed."  2009 WL 1587158, at *3.  In contrast, plaintiffs sought for the term to "include within [it] not only the horizontal surface or plate but also the supporting structure thereto, namely, struts, legs, *etc.*, that is then attached to and moves in conjunction with the motors or other means of moving."  2009 WL 1587158 at *3.  After considering the arguments made by Grober before the PTO during the re-examination of the '662 patent and the PTO examiner's reaction thereto, the Court concluded that the prosecution history compelled the conclusion that "the payload platform is the flat horizontal metal plate to which the camera is attached *and nothing else*, be it the metal arms or legs immediately supporting that plate, which are in turn connected to the motors continuously moving about to keep the camera stablize[d] by correcting the movement of the base.  Those other parts of the 'structure' (the motors, support struts, legs, *etc.*,) do not comprise the payload platform."  2009 WL 1587158 at *12.  Thus, the Court's construction of the term matches in all relevant aspects that sought by defendants.

Plaintiffs have since filed a motion to reconsider the June 22 Order, although in reality the motion is directed entirely to the Court's *Markman* decision and the finding of non-infringement contained therein.[3]

In taking exception to the conclusion of non-infringement contained in the *Markman* decision, plaintiffs note that a party can also infringe a patent by way of the doctrine of equivalents, a doctrine which plaintiffs contend they clearly sought to invoke in the context of adoption of defendants' proposed construction of the claim term "payload platform." Indeed, plaintiffs' statement in their reply brief that the MakoHead would still have an "equivalent structure," and that it is "equivalent" to the payload platform found in the '662 patent, invokes the concept exemplified by the doctrine of equivalents.

In the potion of plaintiffs' *Markman* papers concerning the construction of the claim term "payload platform," their argument focused nearly exclusively on the contention that the accused device, in particular whether the areas on the MakoHead where the second sensor package was placed, was nothing but a thinly disguised effort to recreate a payload platform.  To that end, plaintiffs' *Markman* reply brief made great efforts to demonstrate how *defendants' accused product* sought to achieve the same function of the '662 patent's payload platform without literally copying the same exact process by juxtaposing the two devices:

> [A] photograph of the Perfect Horizon which shows the payload platform (Exhibit 6) . . . as a single machined element that attaches to the motors or means for moving and includes the horizontal attachment plate.  Mako's marketing photographs of their MakoHead, Exhibits 3 and 4, shows Mako essentially cut Grober's solid payload platform into 5 pieces (three segment top plate and two vertical segments) bolted them together,

---

[3]  Given that plaintiffs' motion in reality is one for reconsideration of the Court's *Markman* decision, the intimations in their present motion that they will also later be filing a motion for reconsideration of the *Markman* decision itself is inappropriate.  Plaintiffs are utilizing the present motion, their characterization of it notwithstanding, as a not-so-thinly disguised means to seek reconsideration of a portion of the Court's *Markman* decision itself where the Court found non-infringement, not the June 22 Order which did nothing but repeat and carry out that finding explicitly made in the *Markman* decision.  If plaintiffs wished to raise other arguments with the Court's *Markman* decision, the time to have done so was now in connection with the present motion.  Accordingly, the Court construes the present motion as a motion to reconsider its *Markman* decision.

made the center section silver, and is now asking the Court to define just the center silver section as the payload platform, defined as where the camera is 'directly mounted, and not any other element of the device.'  Wherein Grober's Perfect Horizon machines this payload platform from a single piece of square tube, it can be seen that Mako achieves the same result and function by rigidly bolting together three pieces of flat stock across the top and two vertical members which attach to the motors or means for moving.  Not only is this just a colorable variation, but Mako's own photograph (Exhibit 4) show the camera resting on all three of the contiguous top platform sections which are firmly bolted together and to the platform's vertical components.

(Pls' Reply *Markman* Br. at 6-7).  For the benefit of the reader, the Court has attached as an addendum to this Order the exhibits (3,4, and 6) referenced in plaintiffs' reply *Markman* brief.

What plaintiffs do not take into account, however, is that portion of the *Markman* decision wherein the Court expressly made mention of the doctrine of equivalents and how the doctrine is constrained in its application by concessions and representations made by the claimant before the PTO.  Specifically, the Court quoted an Eastern District of Pennsylvania decision for the proposition that "arguments and amendments made by the patent owner during the prosecution are pertinent to claim interpretation. . .  *They also limit the allowable equivalents under the doctrine of equivalents . . . .  This prevents the patent owner from construing the claims narrowly before the PTO and broadly before the courts.*"  2009 WL 1587158, at *5 (quoting *Total Containment, Inc. v. Environ Prods., Inc.*, 921 F. Supp. 1355, 1389-90 (E.D. Pa. 1995) (emphasis added)).  In the course of its *Markman* decision, the Court concluded that, based on the representations made to the PTO by Mr. Grober, the term "payload platform" is "the flat horizontal metal plate to which the camera is attached *and nothing else*, be it the metal arms or legs immediately supporting that plate."  2009 WL 1587158 at *12 (emphasis in original).

That said, plaintiffs are indeed correct that the *Markman* decision itself did not expressly explain how it was not possible for defendants' accused product to still infringe the '662 patent through the doctrine of equivalents even after the Court's adoption of the defendants' construction of the term "payload platform" and the Court's implicit finding

1   regarding file wrapper estoppel limitation on the extent of that doctrine.  The Court finds,

2   however, based on the record presently before it that, in the final analysis, resort to the

3   doctrine of equivalents to maintain this infringement action also falters due to (1) plaintiffs'

4   failure to articulate, much less present evidence demonstrating, said equivalence, and (2)

5   just as importantly, the limitations placed on plaintiffs' ability to resort to the doctrine in light

6   of concessions Grober made to the PTO during the re-examination of the '662 patent so as

7   to avoid prior art.

8   A.   <u>Doctrine of Equivalents and File Wrapper Estoppel</u>

9        "The doctrine of equivalents allows extension of a patent's scope of protection

10  beyond the patent's literal claim language, but the claim language continues to provide the

11  measure for determining infringement."  5A DONALD S. CHISUM, CHISUM ON PATENTS §

12  18.04[1][b] at 18-604 (2006).  Application of the doctrine of equivalents, however, can be

13  narrowed considerably due to amendments and representations made by the patent's

14  inventor concerning the patent in question during proceedings before the PTO.

15  Consideration of the narrowing effect such amendments and representations can have has

16  come to be known as file wrapper estoppel (due to its linkage to the prosecution history of

17  the patent).  That said, "file wrapper estoppel does not require narrow literalism or

18  complete abandonment of the doctrine of equivalents. . . .  [T]he message [in the case law

19  instead] is that a court should not construe a narrow claim of a patent so as to render it

20  equivalent in scope to a broader claim surrendered during the course of Patent Office

21  proceedings on the application for a patent." 5A CHISUM ON PATENTS § 18.02[3] at 18-38;

22  *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002)

23  ("[w]hen the patentee responds to [a] rejection [by the PTO] by narrowing his claims, this

24  prosecution history estops him from later arguing that the subject matter covered by the

25  original, broader claim was nothing more than an equivalent").

26       "[T]he [Supreme] Court [has] held that if a patentee narrows an amendment, it

27  should be presumed to have surrendered all equivalents to the amended claim limitation.

28  A patentee may rebut the presumption by that 'the equivalent [was] unforeseeable at the

1   time of the application,' 'the rationale underlying the amendment [bore] no more than a

2   tangential relation to the equivalent in question,' or there was 'some other reason

3   suggesting that the patentee could no reasonably [have been] expected to have described

4   the insubstantial substitute in question'" 5A CHISUM ON PATENTS § 18.02[6] at 18-60

5   (quoting *Festo*, 535 U.S. at 740-41).

6       Moreover, as the Supreme Court later observed in *Warner-Jenkinson Co., Inc. v.*

7   *Hilton Davis Chemicals Co.*, 520 U.S. 17, 41 (1997), in regards to when the doctrine of file

8   wrapper estoppel was invoked based on actions taken by the PTO, "[i]n each instance, a

9   change was demanded because the claim as otherwise written was viewed as not

10  describing a patentable invention at all — *typically because what it described was*

11  *encompassed within the prior art*."  (emphasis added).  "When, however, the patentee

12  originally claimed the subject matter alleged to infringe but then narrowed the claim in

13  response to a rejection, he may not argue that the surrendered territory comprised

14  unforeseen subject matter that should be deemed equivalent to the literal claims of the

15  issued patent.  On the contrary, 'by the amendment the patentee recognized and

16  emphasized the difference between the two phrases, and the difference which the

17  patentee thus disclaimed must be regarded as material.'" *Festo*, 535 U.S. at 734.

18      That is precisely what occurred here.  As recited in great detail in this Court's

19  *Markman* Order, the "payload platform" claim language in the '662 patent was surrendered

20  application of the '662 patent to certain areas on a gimbal-based device and the language

21  was narrowly construed by the PTO examiner (after having initially rejected the patent

22  altogether and after taking into consideration representations made by Grober) all in order

23  to avoid prior art (namely, the Welch and Duckworth patents).  Specifically, Grober

24  distinguished the prior art in the Welch and Duckworth patents by noting that, in each

25  case, the second sensor package was not located on the relevant portion of the prior art

26  that was to be considered analogous to the payload platform in the '662 patent.  The PTO

27  accepted Grober's representations and held that, for example, with the Welch patent that

28  the analogous structure to the '662 patent's payload platform was item number 16, the

1    Stabilized Structure, and not item number 18, the Platform Structure, upon which a sensor

2    package, item number 27 the Pitch Potentiometer, was arguably affixed.  This is important

3    because item 18 on Welch comprised those portions of the gimbal-based system that were

4    between where the camera was directly mounted and the base where the motors were

5    located.  By exempting this region of the gimbal-based device from consideration to avoid

6    Welch, Grober correspondingly surrendered any contention that placement of the sensor

7    package on any of the supports or other things to which the platform was affixed was

8    equivalent to the '662 patent's payload platform lest it transgress the prior art.  On account

9    of those representations by Grober and the actions of the PTO taken in reliance upon the

10   same the Court concluded that "the payload platform is the flat horizontal metal plate to

11   which the camera is attached *and nothing else*, be it the metal arms or legs immediately

12   supporting that plate."  (emphasis in original).  The Court further noted that, were the

13   payload platform to be anything else such as "the supporting struts, legs, etc., as

14   advocated by Grober, then not only would this be inconsistent with the position advocated

15   by him and then adopted by the PTO during the re-examination proceedings, but it would

16   render claim 1 in the '662 patent invalid as it would have been rendered obvious or

17   anticipated by the prior art."

18       Now plaintiffs seek to advance the argument that other pieces in this portion of

19   defendants' accused gimbal-based system -- between the motor at the base and where

20   the movie camera is directly affixed (the black plate in the photos of the accused device he

21   provided in their reply *Markman* briefs) to which sensor packages are affixed -- should be

22   treated as the equivalent to the payload platform in the '662 patent.  Such an argument is

23   based on the contention that the parts in question are actually bolted to the "black plate"

24   and that the camera actually rests on all three sections (the black plate and the two

25   horizontal "flat stock" that lie "across the top" with "two vertical members" attaching "to the

26   motors.")  In other words, Grober seeks to equate other portions of the accused device

27   beyond that where the device is directly mounted as being the equivalent of the '662

28   payload platform.  Such a reading is estopped by the representations Grober made, and

8

1   the PTO accepted, in the context of the '662 re-examination proceedings.  Nothing but the

2   portion of any accused device where the camera is directly mounted upon can count as

3   the payload platform.  Grober's efforts to expand the structural area that is reached by

4   claim 1 in the '662 patent's reference to "payload platform" as the functional equivalent

5   thereto is barred.

6        Moreover, the evidence submitted by Grober, and that which has been

7   supplemented by defendants in the context of the present motion, do not demonstrate his

8   contentions that the these other sections are bolted and locked in place with the black

9   plate or that the "camera rest[s] on all three of the contiguous top platform sections."

10       Plaintiffs bore the burden of proof on establishing infringement by way of the

11  doctrine of equivalents.  Regarding that burden, a distinction is drawn between whether the

12  patent owner is arguing infringement based on the doctrine of equivalents or is simply

13  defending against an assertion of patent invalidity being advanced by the accused

14  infringer.  If it is the former (as it is here), then the patent owner holds the burden of proof

15  and if the latter the accused infringer bears the burden:

16           Consider four situations: (1) the patentee alleges literal
             infringement and the accused infringer alleges that the accused
17           product or process is identical to one found in the prior art; (2)
             the patentee alleges literal infringement and the accused
18           infringer alleges that the accused product or process is an
             obvious variation or adaptation of the prior art; (3) the patentee
19           alleges infringement under the doctrine of equivalents and the
             accused infringer alleges that the accused product or process
20           is identical to one found in the prior art; and (4) the patentee
             alleges infringement under the doctrine of equivalents and the
21           accused infringer alleges that the accused product or process
             is an obvious variation or adaptation of the prior art. In the first
22           and second situations (literal infringement charged), Federal
             Circuit decisions tend to treat the prior art as relevant only to
23           the invalidity defense upon which the accused infringer bears
             the burden of proof. . . . By way of contrast, in the third and
24           fourth situations, in which the charged infringement is through
             the doctrine of equivalents and the counter assertion is that the
25           accused product or process is identical to, or obvious in view
             of, the prior art, the Federal Circuit has consistently
26           acknowledged that the prior art constrains infringement apart
             from any defense of invalidity over the prior art[,] . . . that is, the
27           patentee bears the burden of proving infringement, which is
             one of persuasion or otherwise stated by a preponderance of
28           evidence.

9

5A CHISUM ON PATENTS § 18.04[2][d][i][B] at 18-708, 18-709, 18-715.

Here, Grober is in essence seeking for the Court to declare as equivalent to his patent a device that even he admits does not place the second sensor package on the payload platform as defined by the Court, but instead has the package affixed to the other parts of the structure both underneath it and beside it; in other words on the gimbal support structure itself.  This was the very claim that the PTO rejected as falling within the claims contained in the Weber and Duckworth prior art.  Grober was well aware of this fact when defendants' expert, Mr. Thomas Smith, testified during a deposition *before* the *Markman* hearing took place that between the '662 patent and the Welch and Duckworth prior art, defendants' Makohead was "similar" to the Welch prior art.  As Mr. Smith explained:

> THE WITNESS: . . . [The camera] is mounted to a [silver] aluminum plate that extends off the surface of the table top so that the MakoHead can be mounted through a hole in that plate and held in position.
>
> Q.    Okay.  And we talked about another second — or a second sensor grouping in the MakoHead this morning being attached on the *gimbal structure*?
>
> A.    Right.
>
> . . . .
>
> Q.    Okay.  And that base-type construction, is it connected to the top plate [where the camera is mounted], or is it connected as piece of the gimbal structure?
>
> A.    It is connected as a piece of the gimbal structure.
>
> . . . .
>
> Q.    Okay.  What is the payload platform of the MakoHead?
>
> A.    The payload platform is the upper plate and distinctly the upper plate being this height.  It is the plate which is directly in contact with the payload structure being the camera or perhaps the tilt pan mount which is attached to the top.
>
> . . . .
>
> Q.    Okay.  And what would the camera support platform of the MakoHead be?

A.    This upper black plate.

Q.    Okay.  Are there any sensors of the MakoHead that are mounted on the top black plate?

A.    There are no sensors there mounted.

Q.    Mr. Smith, I'm going to ask you to actually bend down and look for me underneath that [center] plate and tell me if you can detect, with the naked eye, that the top plate of the MakoHead is not actually attached to that box right there [that plaintiffs claim to be nothing more than a chopped up payload platform]?

A.    It is not actually attached, because there is daylight passing through the space that separates the payload platform plate from the black piece, which is the cover for the tilt sensor housing.

                                            . . . .

Q.    And after read [Grober's representations to the PTO], from your expertise, do you believe the MakoHead to be more like the Grober device or more like the Welch device?

A.    My belief is that since the location – the sensors are located in separate positions and neither is on the payload platform, then it is more similar to Welch.

(Defs' Opp., Ex. A).

        Rather than submitting their own expert to respond to this defense evidence supporting the Court's finding of non-infringement (again, bearing in mind that it is plaintiffs who bear the burden of proof on an issue they expressly raised in their *Markman* briefs and now in their motion for reconsideration), plaintiffs instead complain that the evidence was not in the record before the Court at the time the *Markman* decision was made and therefore it should not be considered now.  They do state that, if the Court is going to entertain this defense evidence, then they "should be entitled to submit a declaration from its unbiased technical expert Jim Radford."  (Reply at 5).  However, plaintiffs could have, if they so wished, attached Mr. Radford's expert declaration to their reply (just as defendants submitted their expert's deposition to their opposition).  There was no need to seek permission from the Court before doing so.  However, even more stunning is that, in the

11

*five weeks* since plaintiffs noted the existence of such allegedly probative expert evidence (their reply brief was filed on September 14, 2009), they have not sought at any point to so supplement their reply papers.  Moreover, when at the hearing on the present motions the Court afforded plaintiffs' counsel an opportunity to articulate plaintiffs' argument on equivalency in light of defendants' expert report, he refused to do so, stating that plaintiffs had never received defendants' response of non-infringement during discovery.  Given that it is *plaintiffs*' burden to establish equivalency, whatever failures there may exist as to defendants' articulation of *non-infringement* does nothing to alleviate plaintiffs' initial burden of establishing that there was infringement.  Finally, it must be remembered that Grober squarely placed the question of equivalents squarely at issue in their *Markman* briefs and now in their motion for reconsideration.  For the reasons stated above, the Court holds that they have failed to meet their burden of proof on the matter.

Accordingly, plaintiffs' motion for reconsideration of the June 4, 2009, *Markman* decision and the June 22, 2009, Order are hereby **DENIED**.

Having reaffirmed this Court's earlier finding of non-infringement, defendants' motion regarding co-inventorship is **DENIED** as moot because it is only being brought as yet another means to undermine the validity of the '662 patent itself so as to avoid infringement.  However, the Court notes that, but for this finding of non-infringement, it would have denied defendants' motion as questions of fact clearly exist concerning the exact workings and reduction to practice of Grober's 1994 "Grey Gimbal," a prototype device he created a couple of years before coming into contact with the alleged co-inventors.

The Court **GRANTS** Grober's motion to discharge his attorneys and proceed pro se for the remainder of the litigation in this case concerning defendants' counterclaim for defamation against him.  However, before such discharge is formalized, the Court directs the parties to either stipulate or hold a hearing before the Magistrate Judge assigned to this case to establish a "no-look list" regarding Mr. Grober's ability to look at information or other discoverable evidence that constitute trade secrets of defendants.   The Court notes

in that regard that Grober himself concedes that such a "no look" list is appropriate given his status as a competitor of defendants, and further notes that he has proffered a trade secrets guideline to assist in the process of crafting such an order.  Once such a no look list is ordered by the Magistrate Judge, then Grober's present counsel will be officially discharged from further representing him in this matter.

Defendants' request to preclude Grober from addressing topics at hearing is therefore **DENIED** as moot.

IT IS SO ORDERED.


Dated:  October 21, 2009

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

13